IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Chapter 7 |
| RESOURCE TECHNOLOGY ) | |
| CORPORATION, ) | Case No. 99 B 35434 |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| ) | |
| UNGARETTI & HARRIS, LLP, ) | |
| ) | |
| Plaintiff, ) | Adversary Proceeding No. |
| v. ) | 06 A 00907 |
| ) | |
| JAY A. STEINBERG, not individually but ) | |
| solely as Chapter 7 Trustee for RESOURCE ) | |
| TECHNOLOGY CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court on the defendant's motion for approval of

a settlement. The defendant, Jay Steinberg, is the Chapter 7 trustee of debtor Resource

Technology Corporation ("RTC"). The plaintiff, Ungaretti & Harris, LLP ("U&H") was

counsel to RTC's former Chapter 11 trustee, Gregg Szilagyi. U&H asserts in its complaint (1)

that it provided services to preserve the collateral of certain secured creditors while the case

was proceeding in Chapter 11, (2) that it holds a claim of at least $1.5 million for these

services, recoverable under § 506(c) of the Bankruptcy Code (Title 11, U.S.C.), and (3) that it

is entitled to payment of this § 506(c) claim from funds that Steinberg obtained through an

earlier settlement of claims that RTC had asserted against the secured creditors. In addition,

U&H and Szilagyi have asserted substantial administrative claims for the services they rendered to the RTC estate.

Steinberg now proposes a settlement with U&H and Szilagyi that would, among other things, provide U&H with a cash payment of $253,190, waive a claim of the estate for disgorgement of fees that U&H has already received, provide U&H with an allowed Chapter 11 administrative claim of $1,857,270, and provide Szilagyi with an allowed Chapter 11 administrative claim of $250,000.

As discussed below, U&H is unlikely to prevail on its complaint, both because U&H was not given an allowance under § 506(c) on motion of a trustee, and—more fundamentally—because any claim under § 506(c) could only be payable to the RTC estate, not to U&H. Thus, whatever claims U&H has against the RTC estate are only payable as Chapter 11 administrative claims, subordinated to the costs of administration of the case in Chapter 7 and payable pro rata with other Chapter 11 administrative claims. The assets in RTC's estate are not likely to allow payment of Chapter 11 administrative claims in full, and so the payment to U&H and the waiver of the estate's disgorgement claim proposed by the pending settlement are outside the range of reasonable litigation outcomes in this proceeding. Moreover, the proposed allowance of administrative claims for professional fees without judicial review is improper. Accordingly, the motion to approve the settlement will be denied.

### Jurisdiction

District courts have exclusive jurisdiction over bankruptcy cases, pursuant to 28 U.S.C. § 1334(a), and they have concurrent jurisdiction over all civil proceedings "arising under" the Bankruptcy Code, pursuant to 28 U.S.C. § 1334(b). The pending settlement motion involves the allowance of claims against the estate and approval of the use of estate property, both matters that "arise under" the Code (§§ 502(b) and 363(b)) and so are within the district

court's jurisdiction. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987)

("Congress used the phrase 'arising under title 11' to describe those proceedings that involve a

cause of action created or determined by a statutory provision of title 11.")

Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the

District Court for the Northern District of Illinois has referred its bankruptcy cases to the

bankruptcy court of this district. When presiding over a referred case, the bankruptcy court

has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core

proceedings within the case. The settlement motion is a core proceeding under 28 U.S.C.

§ 157(b)(2)(B) (allowance or disallowance of claims against the estate) and (M) (orders

approving use of property), and so may be finally decided by this court. *See In re Telesphere

Communications, Inc.*, 179 B.R. 544, 546 (Bankr. N.D. Ill. 1994) (finding core jurisdiction

over a motion to approve the settlement of a claim asserted by the estate).

## Background

*The RTC bankruptcy case.*

Resource Technology Corporation ("RTC"), the debtor in this bankruptcy case, is a

corporation in the business of removing methane gas from landfills and, where possible, selling

the gas or converting it to usable energy. In November 1999, RTC was subject to an

involuntary bankruptcy proceeding; it consented to entry of an order for relief in January

2000.

RTC's principal secured creditors, at all relevant times, have been a group including

Leon Greenblatt, Banco Panamericano, Chiplease, Inc., and other related entities (collectively

"the Lenders"). The Lenders include controlling persons of RTC and provided RTC's debtor

in possession financing, secured by a lien on nearly all of its assets.

3

RTC operated as a debtor in possession until August 2003. At that point, problems with its management, including unauthorized payments to professionals and failures to file timely operating reports, led to Szilagyi's appointment as the Chapter 11 trustee. Szilagyi administered the RTC estate for about 2 years.

As part of his administration of the RTC estate in Chapter 11, Szilagyi, represented by U&H, took action to preserve estate assets (the Lenders' collateral) from legal challenges by other entities, but he also took action against the Lenders themselves. This included filing the following adversary complaints against Lenders' entities:

• *Szilagyi v. Greenblatt et al.*, No. 04 A 3867, filed October 22, 2004, alleged that the Lenders converted a payment of $145,000 from Commonwealth Edison Company to RTC.

• *Szilagyi v. Greenblatt et al.*, No. 04 A 4068, filed November 16, 2004, sought to enjoin the lenders from taking any action to enforce their liens against property of the estate.

• *Szilagyi v. Loop Corp. et al.*, No. 05 A 0025, filed January 10, 2005, sought judgment against entities controlled by the Lenders in the amount of $1,589,250 for unauthorized transfers of estate property.

In September 2005, the case was converted to Chapter 7, and Jay Steinberg was appointed trustee. Steinberg initially continued the business operations of RTC, but ceased doing so in March 2006. He has since been engaged in liquidating the estate assets.

*Background of the pending settlement.*

The settlement agreement now under consideration would resolve two major outstanding disputes involving the RTC estate. One of these disputes involves the services rendered by Szilagyi and U&H. For his services as Chapter 11 trustee, Szilagyi has filed a final application for allowance of a Chapter 11 administrative claim in the amount of $678,317.30. (Bankruptcy Docket No. 3001.) U&H has filed a final application seeking allowance of a Chapter 11 administrative expense of $1,953,402.50 in legal fees and

4

support of the Szilagyi/Lender Settlement, also adopted this view. In response, Szilagyi

decided before the hearing ended to withdraw his request for approval of the settlement and

to proceed simply on his request for dismissal of the bankruptcy case. (See Transcript of

September 20, 2005, Ex. B to Motion of the Chapter 7 Trustee, Bankruptcy Docket No. 2863,

at 9-10.)

At the hearing, a need for further bankruptcy administration was shown, including

U&H's receipt of $376,235.54 from the RTC estate without court authorization.[1]  On

September 21, 2005, the court entered an order denying Szilagyi's motion "to the extent not

withdrawn." (Bankruptcy Docket No. 2566.) At the same time, the court entered an order

converting the case to Chapter 7. (Bankruptcy Docket No. 2567.) Jay Steinberg was

appointed Chapter 7 trustee.

Thereafter, U&H voluntarily transferred the Lender Funds to counsel for Steinberg, to

be held in escrow pending subsequent court order. U&H did not, however, give up its claim

to the Lender Funds: U&H, the Lenders, and Steinberg (on behalf of RTC's Chapter 7

estate), all continued to assert a right to the funds.

On December 15, 2005, Steinberg sought to terminate the Lenders' claim to the

Lender Funds through a new motion to approve the Szilagyi/Lender Settlement. (Bankruptcy

Docket No. 2863.) Steinberg argued that Szilagyi had done all that was required of him under

---

[1] U&H's employment by Szilagyi was approved on August 28, 2003, with compensation
subject to further court order. (Bankruptcy Docket No. 1811.) An order of September 18,
2003 (Bankruptcy Docket No. 1830) allowed U&H to seek interim compensation by
presenting a monthly statement to specified parties, and then receiving 80% of the stated fees
and 100% of the stated expenses from the debtor if there were no objections to the monthly
statement. Any such payments, however, were "subject to the court's subsequent approval as
part of the normal interim fee application process approximately every 120 days." U&H
received payments from RTC during the period November 2003 to May 2005 on a roughly
monthly basis, but U&H did not file an application for allowance of interim compensation
until September 2, 2005, in connection with its motion to dismiss the bankruptcy case.
(Bankruptcy Docket No. 2540.) Because U&H thus did not engage in the "normal interim fee
application process" required by the September 18, 2003 order, the payments it received were
unauthorized.

6

$215,181.31 in costs. (Bankruptcy Docket No. 3002.) The Lenders have objected to both applications.

The other dispute that the settlement would resolve is a set of competing claims to a $1.5 million payment that the Lenders made during Szilagyi's administration of the case (the "Lender Funds"). Two earlier settlements of disputes between the RTC estate and the Lenders—one negotiated by Szilagyi and one by Steinberg—provide the background for the dispute over the Lender Funds.

*The Szilagyi/Lender Settlement.* During his administration of the RTC estate, Szilagyi entered into a settlement with the Lenders dated June 22, 2005 (the "Szilagyi/Lender Settlement," Bankruptcy Docket No. 2463, Ex. A). This settlement provided that Szilagyi would (1) pursue a motion to dismiss the RTC bankruptcy case, (2) suspend any action affecting the Lenders' collateral pending a ruling on the motion to dismiss, (3) seek dismissal of his injunctive proceeding against the Lenders' lien enforcement activities, and (4) file a timely notice of appeal with respect to an order entered against RTC in an adversary proceeding brought by the Connecticut Resource Recovery Authority. In return, the Lenders agreed to pay $2 million in satisfaction of claims that U&H asserted under § 506(c) of the Bankruptcy Code for preserving the Lenders' collateral. The Lenders paid U&H $1.5 million of this amount—the Lender Funds—when the Szilagyi/Lender Settlement was executed, even though the settlement would not become effective unless approved by the court.

On June 24, 2005, Szilagyi filed a motion both to approve the settlement and to dismiss the case. The motion generated objections from creditors other than the Lenders, and a hearing on the motion was held on September 19 and 20, 2005. During the hearing, the court expressed the view that any recovery on the § 506(c) claim asserted by Szilagyi and U&H would belong to the RTC estate, so that the provision of the settlement calling for payment directly to U&H could not be approved; the United States trustee, reversing his original

5

the agreement and that the agreement would be enforceable upon the court's approval. Critically, the motion contended that Steinberg, as Szilagyi's successor, would obtain the benefits of the settlement (including the Lender Funds) for RTC's Chapter 7 estate: "The Court's approval of the [Szilagyi/Lender] Settlement would make at least $1.0 million immediately available to fund the Chapter 7 cost of administration." (Motion at 8.) Accordingly, Steinberg sought an order "finding that the Chapter 7 Estate is entitled" to the Lender Funds. (*Id.* at 9-10.) On December 28, 2005, the court granted Steinberg's motion. However, on January 3, 2006, the Lenders filed a timely motion pursuant to Fed. R. Bankr. P. 9023 (incorporating Fed. R. Civ. P. 59) to vacate approval of the settlement. (Bankruptcy Docket No. 2927.) The arguments made by the Lenders were substantial, and the court took the motion under advisement.[2] At this time, then, the enforceability of the Szilagyi/Lender Settlement and the disposition of the Lender Funds were still unresolved.

*The Steinberg/Lender Settlement.* Before the court ruled on the Lenders' motion for reconsideration, Steinberg reached a new, global agreement with the Lenders, outlined in a motion to approve the settlement filed on February 17, 2006. (Bankruptcy Docket No. 3091.) The settlement itself (the "Steinberg/Lender Settlement") was filed a week later. (Bankruptcy Docket No. 3101.) The settlement required one of the Lenders' entities to pay all unpaid Chapter 7 operating expenses above $150,000 and to pay the estate (a) an additional $275,000

---

[2] Among its other arguments, the motion

(1) pointed out a provision of the Szilagyi/Lender Settlement requiring that "[i]f the RTC bankruptcy case is not dismissed or any dismissal order entered by the bankruptcy court is reversed on appeal, then the Trustee . . . shall not be entitled to any further payments for professional fees or Trustee's fees from the RTC estate until and unless the sums advanced by the Lenders pursuant to this agreement are repaid to the Lenders by RTC in full,"

(2) noted that Steinberg had already sought and received payment of professional fees without RTC's repayment of the Lender Funds, and

(3) argued that this breach by Steinberg rendered the settlement incapable of being approved. (Motion at 6.)

in cash, (b) 20% of any recovery on any cause of action of the RTC estate conveyed under the agreement, and (c) 20% of any recovery obtained through the prosecution of a pending complaint proceeding brought in the Lenders' own right. (Steinberg/Lender Settlement at ¶ 11(i), (iv), (v).)  In addition, it provided that Steinberg would receive the Lender Funds on behalf of the RTC estate, with the Lenders waiving any claim to those funds.  (*Id.* at ¶ 11(iii).) The Lenders also agreed to forego any Chapter 7 administrative claims, although they retained other claims, both secured and administrative, against the estate.  (*Id.* at ¶ 11(vii), (viii).)

In return, the settlement provided the Lenders with two major items of consideration. The first was the right to obtain assets of the estate, including certain causes of action and the right to designate entities to which Steinberg would seek to assign RTC's unexpired leases and executory contracts. (*Id.* at ¶¶ 4-6.)  The second item of consideration was a release of the RTC estate's claims against the Lenders. (*Id.* at ¶¶ 9-10.)  These included claims for equitable subordination and treble RICO damages that Steinberg had asserted in *The Chapter 7 Bankruptcy Estate of Resource Technology Corp. v. Greenblatt et al.,* 05 A 02521, filed October 27, 2005.  The release also removed any liability that the Lenders had to the RTC estate for preservation of their collateral under § 506(c) of the Bankruptcy Code.

On March 16, 2006, the court approved the Steinberg/Lender Settlement (Bankruptcy Docket No. 3170) and the Lenders' motion to vacate the court's approval of the earlier settlement was withdrawn as moot (Bankruptcy Docket No. 3182).  Pursuant to the Steinberg/Lender Settlement, the court entered an order on March 28 authorizing Steinberg's counsel "to distribute $1.5 million of the funds held in escrow relating to the Settlement Agreement to Steinberg for the benefit of the Estate." (Bankruptcy Docket No. 3201.)

Steinberg's settlement with the Lenders, however, did not resolve U&H's claims. On April 4, 2006, U&H filed the present adversary proceeding, seeking injunctive relief and turnover of the Lender Funds.  U&H asserted three grounds for claiming the funds:  (1) as the

8

entity whose services provided the basis for the § 506(c) claim treated by the Szilagyi/Lender

Settlement, U&H is entitled to payment of the Lender Funds as a § 506(c) recovery; (2) U&H

is entitled to the imposition of a constructive trust on the Lender Funds for unpaid trustee

fees and attorneys' fees incurred in the course of administering the case in Chapter 11; and (3)

Szilagyi and U & H have a claim in quantum meruit that should be paid out of the Lender

Funds. Along with its adversary complaint, U&H filed a motion for preliminary injunction to

prevent Steinberg from expending the Lender Funds.

*The pending settlement.*

Once again, before any ruling on the motion for preliminary injunction or the pending

fee applications of Szilagyi and U&H, Steinberg proposed a global settlement, the subject of

the motion now before the court. The terms of this agreement (the "Steinberg/U & H

Settlement") are set out in the motion. (Adversary Docket No. 26.) Under the agreement,

U&H and Szilagyi would waive both their claims to the Lender Funds and any other claims

not set out in the agreement. In exchange, the RTC estate would provide the following

consideration:

1. Payment of $253,190.22 to U&H, of which $217,373.72 is attributed to expenses

incurred while assisting Szilagyi in Chapter 11 administration and $35,816.50 is attributed to

"transition services" rendered to assist Steinberg in Chapter 7 administration.

2. An allowed Chapter 11 administrative claim for U&H in the amount of $1,857,270.

3. Waiver of the estate's claim for disgorgement by U&H of the $376,235.54 that U&H

received from the estate during Szilagyi's administration, in that U&H would be allowed to

credit this amount against its allowed Chapter 11 administrative claim.

4. An allowed Chapter 11 administrative claim for Szilagyi in the amount of $250,000.

The Lenders have opposed the motion to approve the Steinberg/U&H Settlement.

*The present condition of the RTC estate.*

At the court's direction, Steinberg reported the extent of the assets of the RTC estate and the outstanding administrative claims against it. (Bankruptcy Docket No. 3637.) His report reflects that as of October 23, 2006, the RTC estate consisted only of (1) $608,426 in cash and (2) the right accorded by the Steinberg/Lender Settlement to share in the proceeds of litigation assigned to or brought by the Lenders. (*Id.* at ¶¶ 16-17.) The report estimates that professional fees in the Chapter 7 case, for which the Lenders are not responsible, will total approximately $600,000. (*Id.* at ¶ 18.) Paying the Chapter 7 professional fees would exhaust the estate's cash supply, leaving the estate with no current funds to pay administrative claims that arose during Chapter 11 administration. The report states that pending Chapter 11 administrative claims total approximately $87 million. (*Id.* at ¶ 23.)

## Conclusions of Law

The Steinberg/U&H Settlement raises two distinct problems that prevent court approval: first, its cash payment to U&H is outside the range of reasonable litigation outcomes, and second, its allowance of administrative claims to Szilagyi and U&H bypasses the court's obligation to review fee applications independently.

### A. *The cash payment.*

U&H's adversary complaint asserts a claim to the Lender Funds, an asset that the RTC estate now holds; U&H has also asserted what would be a Chapter 7 administrative claim for "transition services." At the same time, the estate has a claim for disgorgement of fees from U&H. In the ordinary course, these conflicting claims would be adjudicated on the merits by the bankruptcy court. The Steinberg/U&H Settlement proposes a resolution of the claims outside the ordinary course, waiving the estate's claim to disgorgement and paying cash from the estate to U&H.

Such a use of estate property outside the ordinary course requires court approval under

§ 363(b) of the Bankruptcy Code, and the proposed use should be approved only if it is in the

best interest of the estate. *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr.

N.D. Ill. 1994). As applied to a proposed settlement, this "best interest" determination

requires the court to "estimate both the value of the proposed settlement and the likely

outcome of litigating the claims proposed to be settled." *Id.* at 553. Based on that estimate,

the court must determine "whether or not the terms of the proposed compromise fall within

the reasonable range of litigation possibilities." *In re Energy Co-Op., Inc.*, 886 F.2d 921, 929

(7th Cir. 1989). The court should disapprove the settlement "only if it falls below the lowest

point in the range of reasonableness." *Id.*

The likely outcome of litigating the conflicting claims of U&H and the RTC estate is

that the estate, not U&H, would receive a net recovery.

    1. *The estate's disgorgement claim.* The estate would very likely succeed in its

claim for disgorgement. The payments that U&H received from the estate during Szilagyi's

Chapter 11 administration were, as noted above, made without court authorization. Thus,

regardless of whether U&H would have been entitled to the payments upon proper

application, the payments are subject to avoidance under § 549(a)(2)(B) of the Code (allowing

the trustee to avoid any postpetition transfers of estate property not authorized by the court).

*In re Powers*, 93 B.R. 513, 516 (Bankr. S.D. Tex. 1988).

More fundamentally, even if the payments had been authorized, they would be subject

to disgorgement in view of the present inability of the RTC estate to pay all of its Chapter 11

administrative expenses. U&H is only one among several entities that provided goods or

services to the RTC estate during its administration in Chapter 11; their resulting

administrative claims amount to some $87 million. Each of these administrative creditors is

entitled to a pro rata distribution of the estate under § 726(b) of the Code. At the same time,

11

§ 726(b) expressly provides that administrative claims incurred in a Chapter 11 case before

conversion to Chapter 7 are subordinated to the expenses of administering the case in Chapter

7 after conversion. *CIT Communications Finance Corp., v. Midway Airlines Corp.*, 406 F.3d

229, 241 (4th Cir. 2005). The Chapter 7 administrative expenses are expected to exhaust all of

the cash that the estate currently possesses. A Chapter 11 administrative creditor who has

been paid interim compensation under § 331—the procedure that U&H was required to

follow to obtain authorization in this case—is required to disgorge the payments if there are

insufficient estate assets to pay all of the other Chapter 11 administrative creditors in full.

*Specker Motor Sales Co. v. Eisen*, 393 F.3d 659, 664-65 (6th Cir. 2004) ("[I]nterim

compensation must be disgorged when necessary to achieve *pro rata* distribution of a Chapter

7 bankruptcy estate."). Thus, in a litigated resolution of its claim for disgorgement, the RTC

estate would very likely be awarded the entire $376,235.54 that U&H has already received for

its services during Chapter 11 administration.

      2. *U&H's claim to the Lender Funds.* In contrast, U&H is unlikely to prevail on

its claim to the Lender Funds. None of the three grounds set out in U&H's complaint to

establish a right to these funds has any likelihood of success.

      a. *Section 506(c).* U&H's primary argument for entitlement to the

Lender Funds is that these funds were a § 506(c) surcharge against the Lenders' collateral.

Section 506(c) provides that "[t]he trustee may recover from property securing an allowed

secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such

property to the extent of any benefit to the holder of such claim." Because a § 506(c) recovery

is charged against collateral held by a secured creditor, it is generally referred to as a "§ 506(c)

surcharge." U&H argues that the entire $1.5 million in Lender Funds was a § 506(c)

surcharge and that U&H is entitled to receive it, as the party that provided services preserving

the Lenders' collateral.

This argument is likely to fail for two reasons. First, the Lender Funds were not awarded to U&H pursuant to a request by a bankruptcy trustee. The Supreme Court has interpreted § 506(c) as allowing a surcharge against collateral only at the instance of a trustee. *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 9 (2000) ("[B]y far the most natural reading of § 506(c) is that it extends only to the trustee . . . .").[3] Szilagyi, as Chapter 11 trustee, sought to obtain a § 506(c) surcharge on behalf of U&H in his motion for approval of the Szilagyi/Lender Settlement, but he withdrew that request after the court indicated it would not be granted. Steinberg, as Chapter 7 trustee, also sought approval of the Szilagyi/Lender Settlement, but with the express condition that the § 506(c) surcharge would be payable to the Chapter 7 estate, not U&H. The court granted Steinberg's motion on that basis. In the end, though, payment of the Lender Funds was approved under the Steinberg/Lender Settlement, with no specific amount attributed to a § 506(c) surcharge. Thus, the court never granted a request by a trustee for payment of the Lender Funds to U&H as a § 506(c) surcharge, and so, under *Hartford Underwriters*, U&H has no claim to the Lender Funds under § 506(c).

Second—although *Hartford Underwriters*, 530 U.S. at 11 n.4, expressly declined to rule on the question—a § 506(c) recovery by a trustee cannot properly be paid to an individual administrative creditor like U&H. Rather, because only a bankruptcy trustee may seek a § 506(c) surcharge, the surcharge can only be recovered for the benefit of the bankruptcy estate. Section 323(a) of the Code defines the role of a bankruptcy trustee as "the representative of the estate"; the trustee has the duty to administer estate property—to "collect and reduce to money the property of the estate" in Chapter 7, pursuant to § 704(a)(4),

---

[3] The Supreme Court has recognized that a Chapter 11 debtor in possession exercises the powers of a trustee pursuant to §1107(a), including the power to seek §506(c) surcharges. *Hartford Underwriters*, 530 U.S. at 6 n.3.

and to operate the estate's business in Chapter 11, pursuant to § 1108. But the Code grants

the trustee no power to pursue claims on behalf of individual creditors against third parties.

*Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1347 n.11 (7th Cir. 1987).

Thus, by specifying that only the trustee may surcharge a secured creditor's collateral for the

costs and expenses of preserving or disposing of it, "[t]he plain language of § 506(c) compels

the conclusion that 'a section 506(c) recovery is for the benefit of the estate.'" *In re Ben*

*Franklin Retail Store, Inc.*, 210 B.R. 315, 317 (Bankr. N.D. Ill. 1997) (quoting *Collier on*

*Bankruptcy* ¶ 506.04 (Lawrence P. King ed., 15th ed. rev. 1996)).[4]

---

[4]The most recent edition of *Collier* changes its position, citing *Debbie Reynolds Hotel*
*& Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061
(9th Cir. 2001), for the proposition that "in any instance in which a trustee has incurred an
expense on credit to preserve or dispose of a secured creditor's collateral, and the expense
remains unpaid . . . , any recovery under section 506(c) by the trustee . . . on account of the
unpaid claim properly belongs to the third party whose provision of goods or services provided
the benefit." 6 *Collier on Bankruptcy* ¶ 506.05[1] (Alan N. Resnick & Henry J. Sommer eds.,
15th ed. rev. 2006). One other decision rendered after *Hartford Underwriters*—*In re Nuclear*
*Imaging Systems, Inc.*, 270 B.R. 365 (Bankr. E.D. Pa. 2001)—also approves payment directly
from a secured creditor to an entity that provided services benefiting its collateral. However,
neither *Debbie Reynolds* nor *Nuclear Imaging* presents a convincing rationale for reading
§506(c) as a vehicle for recovery by a trustee for the benefit of an individual creditor.

*Debbie Reynolds*, 255 F.3d at 1067, simply relies on a statement in an earlier Ninth
Circuit decision that a recovery by a trustee under §506(c) "would pass to the claimant with
no gain to the estate." *In re Palomar Truck Corp.*, 951 F.2d 229, 232 (9th Cir. 1991).
*Palomar*, though, provides no support or explanation for this statement, and its main
holding—that an individual creditor may pursue a §506(c) surcharge—was overruled by
*Hartford Underwriters*. Moreover, *Debbie Reynolds* is plainly mistaken in asserting that if a
trustee "paid its counsel's legal fees prior to seeking a surcharge, the effect would be the same
as if the proceeds from the surcharge were distributed directly to . . . counsel." *Debbie*
*Reynolds*, 255 F.3d at 1067. As noted above, if a bankruptcy professional receives interim
compensation in a case that later becomes administratively insolvent, the interim fees are
subject to disgorgement so that all administrative creditors are paid according to the Code's
priorities. Direct payment of a surcharge recovered by the trustee to a particular
administrative creditor would allow a major deviation from these priorities.

Unlike *Debbie Reynolds*, *Nuclear Imaging* does provide a rationale for approving a
direct payment from a secured creditor to an administrative claimant who contributed to the
preservation of the creditor's collateral. But the rationale—express consent of the secured
creditor—is inconsistent with the Ninth Circuit's position that a trustee's recovery under
§ 506(c) may be paid to an individual creditor. Rather, *Nuclear Imaging* cites Fourth Circuit

The "plain meaning" application of § 506(c)—recovery payable only to the estate—is particularly compelling where, as here, the estate is administratively insolvent and the trustee or the trustee's attorneys contend that they provided services generating the right to a § 506(c) surcharge. In this situation, if the surcharge were payable to them, the trustee and counsel would be faced with a major conflict of interest. They would then be able to pursue—and attempt to settle for cash—a personal surcharge claim against the secured creditor to the detriment of claims that they might pursue on behalf of other creditors or the estate, such as § 506(c) claims based on goods or services provided by others or estate claims for avoidance of liens or equitable subordination. Recovering a surcharge for another creditor or pursuing a claim on behalf of the insolvent estate has much less potential benefit for the trustee and trustee's counsel than a payment made directly to them. Thus, trustee and counsel would have a powerful incentive to agree with a secured creditor that the other (creditor and estate) claims be released in exchange for a § 506(c) surcharge paid directly to them.

---

precedent for the rule that a trustee cannot obtain a § 506(c) surcharge unless (1) the estate has already expended funds to preserve or dispose of collateral subject to surcharge, or (2) the trustee at least "can demonstrate that the expense would later [be] repaid in full from estate funds." *Nuclear Imaging*, 270 B.R. at 379-80 & 380 n.11 ) (citing *In re K & L Lakeland, Inc.*, 128 F.3d 203, 207, 212 (4th Cir. 1997)). Where the estate has not yet paid an expense of preservation or disposition and cannot assure that it will pay that expense in full, *Nuclear Imaging* suggests the trustee has no right to § 506(c) surcharge and that any payment by the secured creditor can only be the result of a voluntary agreement—a "carve out" from the collateral proceeds. In other words, *Nuclear Imaging* holds that in the absence of full payment of a collateral-related expense by the estate, the collateral proceeds are "payable to the secured creditor but for its consent to transfer property to a particular administrative claimant." *Id.* at 379. This is a minority view, adopted by only one of the three judges who decided *K & L Lakeland*. *See* 128 F.3d at 211 (Phillips, J., concurring in part) and 212 (Hamilton, J., concurring in part and dissenting in part). But regardless of its conclusion as to the circumstances under which a trustee may seek a §506(c) surcharge, *Nuclear Imaging* is fully consistent with the Fourth Circuit's position—contrary to *Debbie Reynolds*—that where the trustee is entitled to a §506(c) surcharge, the surcharge is payable to the estate, "as an unencumbered asset for distribution to the unsecured creditors . . . [p]ursuant to the distribution rules of §726(a) [and] the priority rules of . . . § 507." *In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 484 (4th Cir. 1994).

Indeed, this case presents just such a situation. Szilagyi and U&H (the law firm of which he was a member) agreed to seek dismissal of the bankruptcy case—waiving all of the other claims they had asserted or could have asserted against the Lenders—as part of an agreement that promised a § 506(c) surcharge of $2 million paid directly to U&H. This agreement may have been negotiated in complete good faith—the court has made no finding to the contrary—but it gave Szilagyi and U&H an interest (in their personal claim to a § 506(c) surcharge) at odds with the interests of other creditors (in claims that would benefit the estate generally).[5]

The Bankruptcy Code takes great care to assure that trustees and their counsel do not hold interests adverse to the estate. *See* §§ 101(14)(E) (a "disinterested person" may "not have an interest materially adverse to the interest of the estate or any class of creditors"), 327(a) (professionals employed by a trustee must be disinterested persons), 328(c) (compensation may be denied to any professional employed under § 327 if at any time during employment the professional is not disinteresed), 701(a)(1) (Chapter 7 trustees must be disinterested), 1104(b) (Chapter 11 trustees must be disinterested). The plain meaning of § 506(c)—that recoveries by the trustee benefit the estate—is consistent with this pervasive policy of disinterestedness: trustee and counsel have no more incentive to pursue § 506(c) claims based on their own services than they do to pursue any other claim for the benefit of the estate. But

---

[5] A similar conflict may have been present in the *Debbie Reynolds* case, discussed at n.4, above. There, counsel for the debtor in possession was allowed to collect a §506(c) surcharge of $50,000 as part of an agreement that foreclosed any other §506(c) surcharges, including a $150,000 claim by another administrative creditor. *Debbie Reynolds*, 255 F.3d at 1064.

a reading of § 506(c) that gives the trustee and the trustee's professionals a personal recovery substantially undermines the policy.[6]

Accordingly, U&H likely has no claim to the Lender Funds as a § 506(c) surcharge.

b. *Constructive trust.*  U&H's second basis for claiming an interest in the Lender Funds is constructive trust.  Under Illinois law, such a trust arises when "a court declares the party in possession of wrongfully acquired property as the constructive trustee of that property." *Suttles v. Vogel*, 126 Ill. 2d 186, 193-94, 533 N.E.2d 901, 904-05 (1988) (dismissing a complaint seeking a constructive trust because it failed to allege "actual or constructive fraud, duress, coercion or mistake").  It may be that a trustee who wrongfully acquired title to property on behalf of the bankruptcy estate could be declared, under state law, the constructive trustee of the property for the benefit of the former titleholder, although U&H has cited no decisions so holding.  *See* 28 U.S.C. § 959(b) (a bankruptcy trustee "shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated.")[7]

Here, the only wrong U&H asserts is that the Lender Funds are a "windfall" to RTC's estate in Chapter 7 because the funds were generated through the actions of Szilagyi and U&H, rather than Steinberg and his counsel.  This argument is incorrect; Steinberg's actions

---

[6] *See also* David Gray Carlson, *Surcharge and Standing:  Bankruptcy Code Section 506(c) After Hartford Underwriters*, 76 Am. Bankr. L.J. 43, 62-69 (2002) (outlining additional arguments in favor of the estate's ownership of §506(c) surcharges).

[7] The decisions U&H cites are ones in which a debtor is alleged to have obtained property wrongfully before the bankruptcy filing, and a claimant to the property asserts a constructive trust so as to remove the property from the bankruptcy estate.  *See, e.g., In re Fieldcrest Homes, Inc.*, 18 B.R. 678 (Bankr. N.D. Ill. 1982) (discussing a complaint brought by an escrow beneficiary for imposition of a constructive trust on funds allegedly diverted by the debtor in violation of the escrow agreement before the bankruptcy filing).  Such constructive fraud claims have been called into question by *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994) (entitlement to a constructive trust, not actually imposed before the bankruptcy filing, does not remove property from a bankruptcy estate).

were instrumental in obtaining the Lender Funds for the RTC estate.[8]  More importantly,

U&H's argument misses the point that a constructive trust requires wrongful conduct, not

simply an unfair result.  *Commodity Futures Trading Commission v. Heritage Capital*

*Advisory Services*, 823 F.2d 171, 172 (7th Cir 1987) ("Before a constructive trust will be

imposed, there must be some wrongdoing on the part of the legal owner.").  U&H has not

suggested any basis for concluding that Steinberg obtained the Lender Funds wrongfully—as

a result of fraud, breach of fiduciary duty, duress, coercion, mistake, or any other misconduct.

To the contrary, Steinberg openly asserted the interests of the RTC estate in the Lender

Funds; he sought to obtain the funds through litigation, and ultimately did obtain the funds

through the Steinberg/Lender Settlement, which was fully disclosed and approved by the

court.  This course of conduct was completely proper.

In any event, to the extent that Steinberg did receive, on behalf of the Chapter 7 estate,

the benefit of unpaid work by Szilagyi and U&H in administering of the case in Chapter 11,

the result is fully consistent with bankruptcy policy—providing the funds necessary to

administer a Chapter 7 liquidation—and not a "windfall."  In an administratively insolvent

Chapter 11 case, parties who provided benefits to the estate—by definition, all of the Chapter

11 administrative creditors—receive less than the full value of their services.  For example, a

creditor who expends substantial effort in finding a hidden asset during the administration of a

case in Chapter 11 is awarded an administrative claim for its expenses under § 503(b)(3)(D)

but is not paid in full from the proceeds of that asset.  Rather, the creditor must share pro rata

with every other Chapter 11 administrative creditor, after payment of Chapter 7

---

[8] In order to obtain the Lender Funds, Steinberg (1) filed and argued the motion to
approve the Szilagyi/Lender Settlement, which Szilagyi and U&H had withdrawn, (2) resisted
the Lender's motion to vacate approval of that settlement, and (3) negotiated and obtained
approval of the Steinberg/Lender Settlement, which required complex negotiation of a
designation rights agreement, and which was likely facilitated by Steinberg's new complaint
against the Lenders.

administrative claims pursuant to § 726(b). *In re Ben Franklin Retail Store, Inc.*, 210 B.R.

315, 319 n.6 (Bankr. N.D. Ill. 1997). Similarly, a trustee's counsel who brings a successful

lawsuit on behalf of the estate is not entitled to payment from the proceeds of the lawsuit. *In

re Chewning & Frey Security, Inc.*, 328 B.R. 899, 918 (Bankr. N.D. Ga. 2005) ("[T]he purpose

and function of counsel for the trustee is to benefit the estate. In fact, all administrative

claimants assist the debtor in maintaining or augmenting the size of the estate . . . . If each of

these parties are entitled to receive payment directly from the 'fund' or 'benefit' they had a

duty to create, preserve, protect, or increase, the distribution scheme would be disrupted.").[9]

U&H's claim for professional fees, like the claims of other Chapter 11 administrative claimants

is this case, may not be paid in full, but that is the proper result of the priorities established by

the Bankruptcy Code, not a wrongful result of conduct by the Chapter 7 trustee.

U&H's constructive fraud claim is also unlikely to succeed.

c. *Quantum meruit.* Finally, U&H asserts "quantum meruit" as a basis

for an interest in the Lender Funds. This claim simply misconceives the nature of quantum

meruit. Quantum meruit does not establish any right to a particular fund of money; it is

---

[9] Indeed, the more significant chance for a windfall here would come from an interpretation of § 506(c) that does not allow a trustee to enforce a surcharge against benefited collateral. If the *Nuclear Imaging* interpretation were adopted (see n.4, above), a secured creditor would be immune from surcharge (and thus receive a windfall) whenever the estate was insolvent, because the estate could not guarantee that the administrative creditor who benefited the collateral would be paid in full. With trustee unable to compel payment of the surcharge, it is not likely that a secured creditor would agree to the voluntary carve out that *Nuclear Imaging* proposes as the only way for an unpaid § 506(c) claim to be satisfied. *See In re K & L Lakeland, Inc.*, 128 F.3d 203, 212 (4th Cir. 1997) (Hamilton, J., concurring in part and dissenting in part) (restricting § 506(c) surcharges to situations in which the estate has or will pay the benefiting creditor in full "permits the very windfall § 506(c) was designed to prevent"). Similarly, under the *Debbie Reynolds* view that unpaid § 506(c) recoveries do not belong to the estate, the trustee for an insolvent estate could not pursue the recovery (using estate assets) when the estate could not benefit—again producing a likely windfall for the secured creditor. *See* David Gray Carlson, n. 6 above, 76 Am. Bankr. L.J. at 66 (*Hartford Underwriters* "has implied that the bankruptcy estate owns [§506(c)] claims. Otherwise, it has established a situation where, in many cases, the trustee inherently cannot afford to do her duty, which directly leads to a secured creditor windfall.").

simply "an equitable remedy applied to the law of contracts to avoid unjust enrichment for services rendered under a contract implied by law." *In re Southern Diversified Properties, Inc.*, 110 B.R. 992, 996 (Bankr. N.D. Ga. 1990). U&H has no need for an equitable remedy to establish its right to compensation for services; it has an express contract with Szilagyi as Chapter 11 trustee, an agreement approved by the court and governed by the Bankruptcy Code. For the reasons discussed in connection with its constructive trust claim, U&H cannot employ quantum meruit to evade the priorities established by the Code. The only bankruptcy decision cited by U&H in support of its claim, *American National Bank & Trust Co. v. Stackler & Holstein (In re Holstein, Mack & Klein)*, 2000 WL 343795 (Bankr. N.D. Ill. March 31, 2000), offers no support for any contrary conclusion. Rather than dealing with the claim of a bankruptcy professional, *Holstein* discusses the quantum meruit claims that the debtor—a law firm no longer doing business—might have had against its former clients. There is no likelihood that U&H's quantum meruit claim would result in any recovery.

3. *U&H's claim for transition services.* U&H has never made a claim for services rendered to Steinberg as Chapter 7 trustee. Nevertheless, the Steinberg/U&H settlement allocates $35,816.50 of the total cash payment to U&H for such services. There is no basis for such a payment. In *Lamie v. U.S. Trustee*, 540 U.S. 526 (2004), the Supreme Court dealt with an almost identical situation: the attorney for a Chapter 11 debtor in possession (exercising the power of a Chapter 11 trustee) provided services in the case after its conversion. Because the Chapter 7 trustee had not retained the attorney under § 327 of the Code, the Supreme Court held that no compensation could be allowed. *Lamie*, 540 U.S. at 531 (affirming circuit decisions interpreting § 330(a) of the Code to provide that "fees may be awarded to attorneys for services rendered only to the extent they are payments to 'a professional person employed under section 327[.]'"). Moreover, the Court found that this result reflected a reasonable policy determination:

20

> Sections 327 and 330, taken together, allow Chapter 7 trustees to engage
> attorneys, including debtors' counsel, and allow courts to award them fees. *See*
> §§ 327(a) and (e). Section 327's limitation on debtors' incurring debts for
> professional services without the Chapter 7 trustee's approval is not absurd. In
> the context of a Chapter 7 liquidation it advances the trustee's responsibility for
> preserving the estate.

*Id.* at 537.

Steinberg has not sought to employ U&H under § 327, and U&H therefore cannot be compensated for services provided after the case was converted to Chapter 7.

4. *Net litigation outcome.* On their conflicting cash claims, then, the RTC estate is likely to recover $376,235.54 from U&H, while U&H is likely to recover nothing from the estate. A settlement of these claims that provides a net payment from the estate to U&H is substantially outside the reasonable range of litigation outcomes, and so may not be approved.

B. *The allowed Chapter 11 administrative expenses.*

In addition to its cash payment to U&H, the Steinberg/U&H Settlement also proposes to give both U&H and Szylagyi allowed Chapter 11 administrative claims for their professional services. Section 330 of the Bankruptcy Code gives courts the power—and the duty, many decisions hold—to review fee applications independently. *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 841 (3d Cir. 1994); *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 870 (Bankr. N.D. Ill. 1989). There is nothing improper in a trustee agreeing not to object to the fees sought by a particular professional, but the absence of an objection cannot limit judicial review or render the fees allowed as an administrative expense. "Even if no objections are raised to a fee application, the Court is not bound to award the fees sought . . . ." *Chas. A. Stevens*, 105 B.R. at 870. And so, although "private compensation agreements are permissible under the Code, the Court retains the responsibility of ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330." *Id.* The Steinberg/U&H

Settlement must also be disapproved, then, insofar as it proposes to eliminate independent judicial review of the Szilagyi and U&H fee applications by awarding administrative claims in fixed amounts.[10]

### Conclusion

For the reasons stated above, a separate order will be entered, denying the Chapter 7 trustee's motion to approve the Steinberg/ U&H Settlement.

Dated:  December 4, 2006

Eugene R. Wedoff
United States Bankruptcy Judge

---

[10] The allowance of the Szilagyi and U&H claims proposed by the Steinberg/U&H Settlement is particularly problematic because the fee applications submitted in support of these claims include significant items that the court would not likely approve, such as requests for reimbursement on account of computer assisted legal research (CALR) that appear to be allocations of overhead expenses. *See In re New Hampshire Elec. Coop., Inc.*, 146 B.R. 890, 902 (Bankr. D. N.H. 1992) (stating that where CALR "has a fixed cost subscriber fee, similar to the cost of subscribing to legal digests and reporters," the cost "is and should be properly included as an overhead expense.").